# Brame, et al. v. Dark Tobacco Growers' Co-operative Association.

(Decided December 18, 1925.)

## Appeal from Christian Circuit Court.

Agriculture—Members of Dark "Tobacco" Growers' Association Not Required to Deliver Burley Tobacco.—Since charter of the Dark Tobacco Growers' Co-operative Association, organized under Bingham Co-operative Marketing Act, did not contemplate the marketing of burley tobacco, in view of practical construction of charter by association in conduct of its business, of marketing contract and of prior organization of an association to market burley tobacco, it could not compel its members to deliver burley tobacco grown by them in 1924; use of term "tobacco" in charter, and marketing contract, in view of frequency of use of term "dark tobacco," being intended to refer to dark tobacco, and clearly used in sense of ejusdem generis.

SELDON Y. TRIMBLE, BREATHITT & BREATHITT and JOHN C. DUFFY for appellants.

FRANK RIVES, ROY G. GARRISON, McKENZIE & SMITH and WALTER LYNCH for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

This action involves the right of the Dark Tobacco Growers' Co-operative Association to compel its members to deliver to it the burley tobacco grown by them during the year 1924. The issues joined involve the construction of the charter of the association and of the marketing contract between it and its members and a reference to the Bingham Co-operative Marketing Act, chapter 1 of the Acts of the General Assembly of 1922, now section 883f, subsections 1-33, Kentucky Statutes. The lower court sustained appellee's contention and required the appellants as members of that organization to deliver to it all the burley tobacco grown by them during the year 1924.

The case was submitted on exhibits including the charter of plaintiff and that of the Burley Tobacco Growers' Association, the agreements signed by the members of those associations and an agreed stipulation of fact. For brevity, reference will be made hereafter to the "Dark Association," the "Burley Association" and "The Bingham Act."

The provisions of the Bingham Act relied on read:

"883f-1. In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation; and to eliminate speculation and waste; and to make the distribution of agricultural products between producer and consumer as direct as can be efficiently done; and to stabilize the marketing of agricultural products, this act is passed.

"Sec. 883f-4. An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping or utilization thereof, or the manufacture or marketing of the by-products thereof; . . . or in any one or more of the activities specified herein.

"Sec.883f-6. a. To engage in any activity in connection with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling or utilization of any aricultural products produced or delivered to it by its members, or the manufacturing or marketing of the by-products thereof. . . . No association, however, shall handle the agricultural products of any nonmember except for storage.

"Sec. 883f-6. g. To do each and every thing necessary, suitable or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the subjects herein enumerated; or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged, and in addition any other rights, powers and privileges granted by the laws of this state to ordinary corporations, except such as are inconsistent with the express provisions of this act; and to do any such thing anywhere.

"Sec 883f-17. The association and its members may make and execute marketing contracts, requiring the members to sell for any period of time, not over ten years, all or any specified part of their agri-

cultural products or specified commodities exclusively to or through the association, or any facilities to be created by the association.

"Sec. 883f-24. Any association may, upon resolution adopted by its board of directors, enter into all necessary and proper contracts and agreements and make all necessary and proper stipulations, agreements and contracts and arrangements with any other co-operative organization, association or associations formed in this or any other state, for the co-operative and more economical carrying on of its business or any part or parts thereof. Any two or more associations may, by agreement between them, unite in employing and using or may separately employ and use the same personnel, methods, means and agencies for carrying on and conducting their respective businesses."

Appellee was organized under the "Bingham Act" and named "The Dark Tobacco Growers' Co-operative Association." As stated in its charter its purposes are:

"a. To promote, foster and encourage the business of marketing dark tobacco co-operatively; to minimize speculation and waste in the production and marketing of tobacco and tobacco products; to stabilize tobacco markets; to handle co-operatively and collectively the problems of tobacco growers;
. . .

"b. To engage in any activity in connection with the grading, handling, processing, drying, storing, shipping, warehousing, manufacturing and marketing of dark tobacco or tobacco products of the association and of its members. . . .

"c. To purchase and sell any dark tobacco or tobacco products of its members; . . .

"k. And to do each and every thing necessary, suitable or proper in the judgment of the directors of this association, anywhere throughout the world for the accomplishment of any of the purposes or attainment of any one or more of the objects herein enumerated, or which shall at any time appear conducive to or expedient for the interests or benefit of the association and the members thereof and to contract accordingly. . . .

"l. The operation and activities of this association shall be limited to activities arising out of the

processing, drying, grading, shipping, storing, warehousing, hauling, manufacturing and marketing of the tobacco or tobacco products of the association and of its members only and to the financing of any of the said operations or its members.

"The association shall not be permitted to buy or sell tobacco except from and for its members only and on a standard co-operative basis; it shall not buy or handle any tobacco whatsoever from nonmembers; or be permitted to go in the open market to buy tobacco or any tobacco products whatsoever.

"m. The association is expressly forbidden to do anything with the intent or effect of lessening the production or use or consumption of tobacco; but this association shall do everything within its power to prevent speculating in the handling of tobacco and tobacco products and to secure for its members a fair price for their tobacco or tobacco products in the markets of the world; and to do everything reasonable within its powers to stabilize to a fair level downward, the prices to be paid by the ultimate consumers; to increase the sale, use and consumption of tobacco and tobacco products by all possible commercial and merchandising methods; and to use every possible means to improve the supply and to extend and increase the demand for tobacco and tobacco products."

Throughout the instrument it is referred to in its corporate name of "Dark Tobacco Growers' Co-operative Association."

The original agreement signed by the members of the association was in two sections, (1) the association agreement and (2) the marketing agreement; the two forming one instrument, signed in one place.

In the association agreement it is provided:

"The undersigned propose to organize a non-profit association, without capital stock, for the purpose of marketing the dark type tobacco co-operatively; for reducing speculation, for stabilizing tobacco markets; for co-operatively and collectively handling the problem of tobacco growers and for other pertinent purposes. . . .

"2. The association may include in its membership any tobacco grower, including the landlord or tenant or lessor or lessee of land on which tobacco

is grown, provided the landlord or lessor receives all or part of his rental in tobacco. . . .

"7a. The board shall appoint an executive committee of five directors. . . .

"b. The directors, among other functions, shall be organized into selling committees, according to each general type of tobacco, particularly dark fired, one-sucker, stemming, Green river and the special kinds of tobacco generally centered about each branch office. . . .

"Each selling committee shall study the problems of the particular type of tobacco grown by members and shall act in an advisory capacity to the board of directors of the association on the problems and policies affecting such type, and generally control the marketing of special kinds within each district. All sales shall be made generally under the direction of the respective selling committees. . . .

"11. The association shall confine itself to the problems and marketing or tobacco and tobacco products only and for its members only. . . .

"13a. If by October 1, 1922, or such extended date as herein provided, signatures of tobacco growers or persons eligible for membership, covering at least two-thirds of the acreage planted to *dark tobacco in 1922,* in Kentucky and Tennessee, shall not have been secured for this agreement . . . the agreement was to be cancelled.

"d. If growers representing two-thirds of any of the four named types of dark tobacco shall sign up this agreement prior to October 1, 1922, or such extended date, the agreements shall go into effect as to any such types; but the association shall not be incorporated therefor prior to such date."

The marketing agreement provides:

"1. The grower is a member of the association and is helping to carry out the express aims of the association for co-operative marketing, for minimizing speculation and waste and stabilizing tobacco markets in the interest of the grower and the public, through this and similar obligations undertaken by other growers.

"2. The association agrees to buy and the grower agrees to sell and deliver to the association

*all of the tobacco produced by or for him* or acquired by him as landlord or lessor, during the years 1922, 1923, 1924, 1925 and 1926.

"8.   The association may sell said tobacco, within or without the United States, directly to manufacturers or exporters or otherwise, at such time and in such form and upon such conditions and terms as it may deem profitable, fair and advantageous to the grower; and it may sell all or any part of the tobacco with or through any other agency established for the co-operative marketing of the tobacco of other growers, under such conditions as will serve the joint interests of the growers and the public."

In section nine it is provided that the title to the tobacco shall vest in the association upon delivery.  In sections 11 and 13 the agreement is made binding upon the grower as long as he produces any tobacco directly or indirectly.

"20.   The association is expressly authorized to exercise any or all of the grading, inspecting, marking, marketing, or other powers or rights granted herein through any central agency to be organized for co-ordinating the activities of this and similar co-operative marketing associations in this and other states.   . . .   "

The last section, 22, provided a blank space with instructions, "State here the type of tobacco you grow, whether dark fired, one-sucker, Green river or stemming."

Burley Association: The association and marketing agreements and charter of the burley tobacco association differ from those of the dark association: (1) In corporate name; (2) aside from the use of the word "burley" in the corporate name the single word "tobacco" is used throughout those instruments without any relation to type or class.   Also in those papers the word "tobacco" appears as corresponding to the words "dark tobacco" appearing in plaintiff's articles and association agreements; (3) there is no provision for a selling committee whose activities are devoted to any particular type of tobacco, as is provided in article 7 of the dark tobacco association agreement; (4) the burley association agreement did not become effective until signed by a certain portion of the burley growers, without reference to the dark tobacco product, and confined its membership to the

burley district, while that of plaintiff is confined to the dark district. In other respects the two instruments are practically identical.

The material part of the agreed stipulation is substantially as follows: (a) The dark association has received 38,960 pounds of the 1923 burley crop, but none of the 1924 crop; (b) burley and dark tobacco are separate and distinct types, are of different character, used for different purposes and grown in geographically distinct territories, though some burley tobacco has always been grown in the dark district and some dark tobacco in the burley district. Burley tobacco is of light weight and color, of thin texture, and is air cured. It is used in the manufacture of cigarettes and cigars, chewing and smoking tobacco and principally consumed in this country. Dark tobacco includes four subtypes known as "dark fired," "Green river," "stemming" and "one sucker." It is chiefly an export crop, approximately 85% of it being used by foreign countries; it is heavy in weight, thick in texture, dark in color and, with the exception of the stemming and one sucker types, is cured by a process known as "firing" and is used in the manufacture of certain types of cigars, cigarettes and smoking tobacco for the foreign trade, a small portion being manufactured into snuff and used in the United States.

Dark tobacco and burley tobacco are handled differently by the producers, are marketed at different points, purchased by different buyers and are generally cured, processed and handled differently.

The burley association was incorporated January 11, 1922, and the dark association November 20, 1922. None of the incorporators of the burley association lived in the dark district or produced dark tobacco and none of the incorporators of the dark association lived in the burley district or produced burley tobacco. At the time the dark association was promoted and organized no mention was made by any person connected with its promotion or organization that it was intended that the dark association would handle any type of tobacco other than that known as dark tobacco, and it was then known to the persons who became members of that association and its organization committee that the burley association had been organized for the purpose of handling the burley type of tobacco and was then in operation. It was also known to these persons that some burley was then being produced in the dark district by some of these per-

sons who became members of the dark association. The terms "dark fired," "one sucker," "stemming" and "Green river" describe different types of dark tobacco and are not descriptive of and never have reference to burley tobacco.

In 1922 and 1923 certain members of the dark association produced burley tobacco which was delivered to the association at its warehouse and for which it issued participation receipts and growers' delivery memorandum in the name of the burley association. In each instance the check for advance payment was enclosed in a letter signed by the president of the burley association written from its home office at Lexington, Ky., and addressing such growers as members of the burley association, although none of them were members of that association.

The dark association agreement provided for an organization committee to ascertain whether or not more than two-thirds of the acreage planted in 1922 was represented by the subscribers to that agreement. In doing this that committee did not consider the burley acreage planted that year by the subscribers or have any information as to this, although it was known to the committee that considerable burley tobacco was planted in the district. No one of the defendants is a member of the burley association or has signed any marketing or association agreement with that association. The dark association has no facilities for the receiving, grading, handling and selling of burley tobacco. Its officers have entered into an agreement with the burley association whereby the burley association is undertaking to receive and handle all burley tobacco grown by members of the dark association and whereby the dark association undertakes to deliver or require its members to deliver all burley tobacco grown by them to the burley association for sale by it. Under this contract the burley tobacco grown by the members of the dark association has been delivered to the burley association and title vested in the burley association and sale thereof governed by the rules and regulations of the burley association and managed by its officers and directors; though neither the dark association nor its members have any control over the handling or sale of burley tobacco delivered to the burley association by either of them. But beginning with the 1924 crop this agreement was changed so as to provide for the delivery to the members of the dark association who delivered burley tobacco to it, the

participation receipts of the dark tobacco association made out according to the grades and qualifications fixed by the officers and agents of the burley association and for advance payments to be made with the checks of the dark association according to the amounts determined by the burley association.

It is insisted by appellant (1) that appellant's marketing contract does not contemplate a delivery of the burley tobacco raised by its members. (2) That if the contract should be construed to require such delivery of burley tobacco that it would be *ultra vires;* that appellee is a corporation effected with a public interest, whose charter must be strictly construed, and therefore it cannot exercise any power except such as is expressly granted or necessarily implied.

On the other hand, appellee argues with equal emphasis that its charter should be given a fair and natural meaning with reference to the objects of the association, and must be liberally construed to include incidental powers reasonably necessary to accomplish its purposes; that the Bingham Co-operative Act, sections 6g and 24, and the articles of incorporation, sections k and m, quoted, *supra,* on their face expressly authorize the execution of such contracts and that the marketing agreement, sections 2, 3, 11, 12, 13a and 17a, *supra,* shows that appellant had agreed to sell all of his tobacco of whatsoever kind to the association.

Without deciding which rule of construction controls, we may for the purpose of this case adopt the one claimed by appellee, as it is apparent that, even thus considered, the language used does not contemplate the marketing of burley tobacco; and this becomes clear when considered in the light of existing circumstances and conditions, and the practical construction thereof given by appellee in the conduct of its business.

Under the liberal provisions of the Bingham Act quoted, *supra,* an association could be formed to market all kinds of farm products, and it would seem that the burley charter is sufficiently comprehensive to include all classes of tobacco grown by its members, as are its association and marketing agreements; however, it has confined its operations to the marketing of burley tobacco, which evidently was its primary purpose. Appellee was organized almost a year later and presumably it was advised as to the situation, and for some reason it did not use the single word "tobacco" as used in the burley ar-

ticles, but instead used the words "dark tobacco." Its purposes were stated to be "to promote, foster and encourage the business of marketing dark tobacco co-operatively . . . to engage in any activity in connection with the . . . manufacture and marketing of dark tobacco and tobacco products of the association or its members. . . .

The same purposes were set forth in its association agreement, which also provided for a sale committee, whose activities were confined to "dark fired, one sucker, stemming, Green river and the special kinds of tobacco generally centered about each branch office" and were required to study the problems of the particular type of tobacco grown by its members. The burley acreage was not listed in the association agreement or considered in determining the acreage planted. These provisions clearly indicate a purpose to confine the activities of the association to matters connected with the marketing of dark tobacco. Perhaps "tobacco products" could refer to tobacco in its natural state; but as the association was authorized to manufacture the tobacco handled by it, the logical meaning of the words "tobacco products" is manufactured products, such as snuff, smoking tobacco, etc. Also the words used in stating the purpose of the association, "to minimize speculation and waste in the production and handling of tobacco and tobacco products, establish tobacco markets to handle co-operatively and collectively the problems of tobacco growers," reasonably interpreted, refer to the class of tobacco therein described, that is, "dark tobacco markets and dark tobacco growers." It is true that the marketing agreement is more liberal in the use of the word tobacco, and taken alone would be construed to require a delivery of all classes of tobacco, but it is the second section of the agreement. The preceding section or association agreement had fully set out and described the purposes of the proposed organization as applying to dark tobacco, and the two agreements must be construed together; not only that, but the articles of incorporation which were later adopted followed the association agreement in this respect, thus construing the dual membership agreement as understood by the incorporators.

In both the association agreement and the charter of appellee, wherever the class of tobacco to be handled is mentioned, reference is made to "dark tobacco" or some type of dark tobacco, and if it had been intended to

include the other classes of tobacco, in view of the careful manner in which these papers were prepared, it is evident that the word "burley" or the words "all kinds of tobacco" or some similar expression, would have been used, and taking into consideration the great number of times in which the words "dark tobacco" appear in these instruments, it is evident that where the general word "tobacco" was used, it was intended to refer to dark tobacco, and is clearly used in the sense of *ejusdem generis,* which is thus defined in 19 C. J. 1255:

> "Where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind."

In the case of the Louisville School Board v. Chi. St. L. & N. O. R. R. Co. 124 Ky. 509, this rule is thus stated:

> "Among the rules for the construction of statutes is to read general words following specific terms, not according to their natural and usual sense, but to restrict them to persons and things of the same kind as those just enumerated."

And again in the same opinion it is said:

> "This rule is like all rules of construction to aid the judicial mind in arriving at what was probably in the legislative mind in using the language employed. The reason of the rule is that as it is clearly indicated, that the legislator was thinking of a particular class of persons or objects, his words of more general description may not have been intended to embrace any other than those within the class."

Appellee argues that the rule is not applicable because the entire genus of "dark tobacco" had been exhausted and the use of the single word "tobacco" indicated a reference to further classes, other than dark tobacco. But the evidence does not show this. While there are four general types of dark tobacco it is not shown that these exhaust the genus.

When viewed in the light of existing conditions it is shown that burley and dark are distinct classes of tobacco, grown in different sections, marketed in different countries, and that they do not come in competition with each other, either at home or abroad, as regards either the purchasers, manufacturers or consumers. Burley is

not manufactured into snuff, which appears to constitute the principal domestic consumption of dark tobacco. So that the manner in which the burley crop is handled does not affect the problems of the dark tobacco growers. An orderly marketing of the burley crop is not shown to be essential to establish the dark tobacco markets or to minimize speculation or waste in the production or marketing of dark tobacco or of dark tobacco products, hence in establishing the dark tobacco market its members were not concerned about the burley product; indeed, the policy of the dark association has been to restrict its activities to marketing dark tobacco. It has provided no facilities for the delivery, grading, marketing or selling of burley tobacco and makes no study of the problems of the burley growers. Heretofore it has turned the burley which was delivered to it by its members over to the burley association, which has handled such tobacco as if it was raised by one of its members. The proposition now is for such tobacco to be receipted and paid for by the dark association at values fixed by the burley association, which will have entire control and disposition thereof, though neither the dark association nor the producer is a member of the burley association or has any voice in the selection of its directorate. This is not in accordance with the letter or spirit of the charter or association agreement.

Appellant insists that the contract between the two associations by which the burley association markets the burley tobacco produced by appellee's members is *ultra vires,* as neither appellee nor any of its members is a member of the burley association, and as the concluding paragraph of section 6a of the Bingham Act, *supra,* provides: "No association, however, shall handle the agricultural products of any nonmember except for storage," but as the burley association is not a party to this suit, and as the case is decided on other grounds it is unnecessary to determine this question. Sections 6g and 24 of the Bingham Act and sections k and m of appellee's charter, *supra,* relied on by appellee, do not authorize or empower the dark association to market any other class of tobacco than that set out in the provisions thereof, but merely undertake to enumerate the activities and incidental powers that it may exercise in accomplishing the object and purpose of its organization, which we have seen do not include the marketing of burley tobacco.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.